**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

FEB 25 2009

JAMES W. McCORMACK, CLERK
By _____ DEP CLERK

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**PINE BLUFF DIVISION**

LEE A. DAVIS, MD.                                              **PLAINTIFF**

**V.**                          CASE NO.: *5:09-cv-058 WRW*

JEFFERSON HOSPITAL ASSOCIATION
d/b/a JEFFERSON REGIONAL MEDICAL CENTER
and ROBERT P. ATKINSON, CEO JEFFERSON
REGIONAL MEDICAL CENTER; LON
BITZER, MD; SHABBIR DHARAMSEY, MD;
HORACE GREEN, MD; DAVID LUPO, MD;    This case assigned to District Judge *Wilson*
CHARLES MABRY, MD; M. BILAL MALIK, MD.; and to Magistrate Judge *Deere*
REID PIERCE, MD; RUSTON PIERCE, MD;
JAMES ALAN POLLARD, MD; George Roberson, MD
RON PRITCHARD, MD; REBECCA WHEELER, MD;                        **DEFENDANTS**

### ORIGINAL COMPLAINT

COMES NOW, Plaintiff, Lee A. Davis, MD., by and through his attorneys, Gene E.

McKissic, of Brown & McKissic, P.L.L.C. and Lloyd W. "Tré" Kitchens, III, of Welch and

Kitchens, LLC, and for his Complaint against Defendants, states:

**I.**
### INTRODUCTORY STATEMENT

1.      This is an action to redress discrimination based on race in violation of 42 U.S.C.

§§ 1981, 1983, and 1985; violation of the Fifth and Fourteenth Amendment to the United States

Constitution; violation of the Federal Health Care Quality Improvement Act of 1986 ("HCQI

Act"), 42 U.S.C. § 11111 et seq.; Retaliation; the pendant state claims of Tortuous Interference

with Business Expectancy and violation of the Arkansas Civil Rights Act; and for a temporary

and permanent injunction; for declaratory judgment; to award Plaintiff costs, attorneys fees and

any other relief to which Plaintiff would be entitled resulting from the unlawful actions of the

named Defendants.

## II.
## JURISDICTION

2.      This Court has jurisdiction pursuant to 28 U.S.C. § 1343(3)(4) to secure the relief authorized by 42 U.S.C. § 1981.  This Court also has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

3.      Venue is proper within this District and Division.

4.      This action arises under the laws of the United States.  The jurisdiction of the Court is based, in part, upon its authority under 42 U.S.C. § 1981 to ensure that "all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . and to ensure that these rights are protected against impairment by nongovernmental discrimination and impairment under color of State law. Further, jurisdiction is also founded upon a violation of the Federal Health Care Quality Improvement Act of 1986 ("HCQI Act"), 42 U.S.C. § 11111 et seq., in that Defendants engaged in a malicious peer review designed to cause economic injury to Dr. Davis.

5.      Each of the claims for relief set forth in this Original Complaint are derived from a common nucleus of operative facts involving substantially identical issues of fact and law such that one would ordinarily be expected to try them in one judicial proceeding.  Consequently, the entire action constitutes a single case wherein all claims should be combined and tried together in the interest of judicial economy, convenience, fairness and in order to avoid unnecessary duplication and multiplicity of actions.  Therefore, this Court has ancillary jurisdiction over all state law claims asserted herein.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Plaintiff resides in this district and because each of the Defendants live and work in this district.

2

## III.
## PARTIES

7.     Plaintiff, Lee A. Davis, MD. (hereinafter "Plaintiff" or "Dr. Davis"), is an individual who resides and practices medicine in Jefferson County, Arkansas. Dr. Davis is an African American and is, therefore, a racial minority.

8.     Defendant, Jefferson Hospital Association d/b/a Jefferson Regional Medical Center (hereinafter "JRMC") is a non-profit corporation organized under the laws of the State of Arkansas, with its principle place of business in Pine Bluff, Jefferson County, Arkansas. Their registered agent for service of process is Robert P. Atkinson, 1515 West 42nd Avenue, Pine Bluff, Arkansas 71603.

9.     Defendant, Robert Atkinson, MD., ("Atkinson") was the Chief Executive Officer and an agent of the hospital at all times relevant herein, and an active member of the Hospital's administrative staff.  Atkinson resides and his principle place of business is located in Jefferson County, Arkansas in the Eastern District of Arkansas.  Atkinson may be served by delivering a copy of this Original complaint to his place of business at JRMC, 1515 West 42nd Avenue, Pine Bluff, Arkansas 71603.

10.     Defendant, Lon Bitzer, MD., ("Bitzer") is a medical doctor licensed to practice in the State of Arkansas specializing in the field of general surgery.  Bitzer was a member of the Invasive Care Committee and the Credentials Committee and he was an agent of the hospital at all times relevant herein.  He was also an active member of the Hospital's medical staff while maintaining a private medical practice offering vascular and thoracic surgery services in Jefferson County, Arkansas.  Bitzer resides and his principle place of business is located in Jefferson County, Arkansas in the Eastern District of Arkansas.  Bitzer may be served by

3

delivering a copy of this Original Complaint to his place of business at 1801 West 40th Avenue, Suite 4A, Pine Bluff, Arkansas 71603.

11.    Defendant, Shabbir Dharamsey, MD., ("Dharamsey") is a medical doctor licensed to practice in the State of Arkansas specializing in the field of cardiology.  Dharamsey was an internal medical peer reviewer and an agent of the hospital at all times relevant herein. Dharamsey was also an active member of the Hospital's medical staff while maintaining a private medical practice offering cardiovascular surgery services in Jefferson County, Arkansas. Dharamsey was a direct economic competitor of Dr. Davis in providing cardiology services. Dharamsey resides and his principle place of business is located in Jefferson County, Arkansas in the Eastern District of Arkansas.  Dharamsey may be served by delivering a copy of this Original complaint to his place of business at 7200 South Hazel Street, Pine Bluff, Arkansas 71603.

12.    Defendant, Horace L. Green, MD., ("Green") is a medical doctor licensed to practice in the State of Arkansas specializing in the field of pediatrics.  Green was the JRMC Medical Chief of Staff and an agent of the hospital at all times relevant herein, and an active member of the Hospital's medical staff while maintaining a private medical practice offering pediatric services in Jefferson County, Arkansas.  Green resides and his principle place of business is located in Jefferson County, Arkansas in the Eastern District of Arkansas.  Green may be served by delivering a copy of this Original complaint to his place of business at 1420 West 43rd Avenue, Pine Bluff, Arkansas 71603.

13.    Defendant, David Lupo, MD., ("Lupo") is a medical doctor licensed to practice in the State of Arkansas specializing in the field of urology.  Lupo was the Chairman of the Credentials Committee and an agent of the hospital at all times relevant herein, and an active

4

member of the Hospital's medical staff while maintaining a private medical practice which offered urological services in Jefferson County, Arkansas. Lupo resides and his principle place of business is located in Jefferson County, Arkansas in the Eastern District of Arkansas. Lupo may be served by delivering a copy of this Original complaint to his place of business at 1609 West 40th Avenue, Pine Bluff, Arkansas 71603.

14.     Defendant, Charles Mabry, MD., ("Mabry") is a medical doctor licensed to practice in the State of Arkansas specializing in the field of general surgery. Mabry was the Medical Director of Quality and an agent of the hospital at all times relevant herein, and an active member of the Hospital's medical staff while maintaining a private medical practice offering vascular surgery services in Jefferson County, Arkansas. Mabry resides and his principle place of business is located in Jefferson County, Arkansas in the Eastern District of Arkansas. Mabry may be served by delivering a copy of this Original complaint to his place of business at 1801 W. 40th Avenue, Suite 7B Pine Bluff Medical Park, Pine Bluff, Arkansas 71603.

15.     Defendant, M. Bilal Malik, MD., ("Malik") is a medical doctor licensed to practice in the State of Arkansas specializing in the fields of hematology and oncology. Malik was a member of the Credentials Committee and an agent of the hospital at all times relevant herein, and an active member of the Hospital's medical staff while maintaining a private medical practice offering hematology/oncology services in Jefferson County, Arkansas. Malik resides and his principle place of business is located in Jefferson County, Arkansas in the Eastern District of Arkansas. Malik may be served by delivering a copy of this Original complaint to his place of business at 1609 W. 40th Avenue, Pine Bluff, Arkansas 71603.

5

16.     Defendant, Reid Pierce, MD., is a medical doctor licensed to practice in the State of Arkansas specializing in the fields of obstetrics and gynecology.  Reid Pierce was the Medical Director of Credentialing and an agent of the hospital at all times relevant herein, and an active member of the Hospital's medical staff while maintaining a private medical practice offering obstetric and gynecological services in Jefferson County, Arkansas.  Reid Pierce resides and his principle place of business is located in Jefferson County, Arkansas in the Eastern District of Arkansas.  Reid Pierce may be served by delivering a copy of this Original complaint to his place of business at 1801 W. 40th Avenue, Suite 1-A, Pine Bluff, Arkansas 71603.

17.     Defendant, Ruston Pierce, MD., is a medical doctor licensed to practice in the State of Arkansas specializing in the fields of obstetrics and gynecology.  Ruston Pierce was a member of the Invasive Care Committee and Credentials Committee and an agent of the hospital at all times relevant herein, and an active member of the Hospital's medical staff while maintaining a private medical practice offering surgical services in Jefferson County, Arkansas.  Ruston Pierce resides and his principle place of business is located in Jefferson County, Arkansas in the Eastern District of Arkansas.  Ruston Pierce may be served by delivering a copy of this Original complaint to his place of business at 1702 W. 42nd, Pine Bluff, Arkansas 71603.

18.     Defendant, James Alan Pollard, MD., ("Pollard") is a medical doctor licensed to practice in the State of Arkansas specializing in the field of orthopedic surgery.  Pollard was a member of the Credentials Committee and Chairman of the Investigative Committee and an agent of the hospital at all times relevant herein, and an active member of the Hospital's medical staff while maintaining a private medical practice offering orthopedic surgery services in Jefferson County, Arkansas.  Pollard resides and his principle place of business is located in Jefferson County, Arkansas in the Eastern District of Arkansas.  Pollard may be served by

delivering a copy of this Original complaint to his place of business at 1609 W. 40th Avenue Suite 501, Pine Bluff, Arkansas 71603.

19.     Defendant, Ron Pritchard, MD., ("Pritchard") is a medical doctor licensed to practice in the State of Arkansas specializing in the field of radiology. Pritchard was a member of the Credentials Committee and an agent of the hospital at all times relevant herein, and an active member of the Hospital's medical staff while maintaining a private medical practice offering radiology services in Jefferson County, Arkansas. Pritchard resides and his principle place of business is located in Jefferson County, Arkansas in the Eastern District of Arkansas. Pritchard may be served by delivering a copy of this Original complaint to his place of business at JRMC, 1515 West 42nd Avenue, Pine Bluff, Arkansas 71603.

20.     Defendant, George Roberson, MD (Roberson) is a member of the Board of Directors for Jefferson Hospital Association. Roberson was a member of the Board of Directors and he was an agent of the hospital at all times relevant herein. Roberson resides in Jefferson County, Arkansas in the Eastern District of Arkansas. Roberson may be served by delivering a copy of this Original Complaint to his place of business at 1801 West 40th Street, Pine Bluff, Arkansas 71603.

21.     Defendant, Rebecca Wheeler, MD., ("Wheeler") is a medical doctor licensed to practice in the State of Arkansas specializing in the field of pathology. Wheeler was a member of the Credentials Committee and an agent of the hospital at all times relevant herein, and an active member of the Hospital's medical staff while maintaining a private medical practice offering pathology services in Jefferson County, Arkansas. Wheeler resides and his principle place of business is located in Jefferson County, Arkansas in the Eastern District of Arkansas.

Wheeler may be served by delivering a copy of this Original complaint to his place of business at 1609 West 40th Avenue, Pine Bluff, Arkansas 71603.

## IV.
## FACTS

22.     Dr. Davis is a medical doctor with a Board Certification in Internal Medicine and Cardiovascular Medicine.  Dr. Davis is also Board Eligible for Interventional Cardiology and will sit for his Board Exam Certification in November 2008.

23.     Dr. Davis was credentialed at JRMC in August 2003 and was appointed to the Active Medical Staff on November 10, 2003.

24.     During 2003 Dr. Davis had no contact with the medical staff that involved any collegial interventions or issues with the medical standards.

25.     On July 23, 2004 Dr. Davis was administratively suspended pursuant to the JRMC's Medical Staff Rules and Regulations for incomplete or delinquent medical records.

26.     Dr. Davis had failed to sign some of his medical records and after going to the office of medical records and signing the records on the same day of the suspension, Dr. Davis' privileges were immediately reinstated.

27.     On August 4, 2004 Dr. Davis had a disagreement with a member of the nursing staff after one of Dr. Davis' patients was allowed to suffer from a heart attack without his knowledge for approximately two hours.  Davis allegedly used profanity with the nursing staff. This was the first incident involving nursing staff and Dr. Davis and the issue was addressed and resolved with a collegial intervention.

28.     JRMC Medical Staff Code of Conduct Policy dictates that complaints about physician go through the nurse's immediate supervisor.  Sherry Yeggy submitted the complaint directly to Dr. Reid Pierce, then JRMC Chief of Staff.

8

29.    Dr. Reid Pierce acted in contravention of JRMC's Medical Code of Conduct Policy by accepting this complaint from nursing staff.  This complaint should have been directed to Bill Bledsoe, Cardiac Administrator and the nurse's supervisor, and not the Chief of Staff as there was no allegation that the nurse's supervisor's behavior was at issue.

30.    Dr. Davis had no other reported contacts with Dr. Reid Pierce that involved any collegial intervention or issues with inappropriate conduct or medical standards during 2004.

31.    On August 27, 2005 a patient (Patient A) was admitted to the hospital from the Drew Memorial Hospital.  The patient was initially admitted to the hospital floor as a normal patient and not a critical care patient.  Patient A was subsequently moved from the hospital floor where the patient was initially admitted, to the CCU floor per request from Bill Bledsoe, Nursing Supervisor and Cardiac Administrator, as a matter of convenience to the hospital, due to the nursing staff on the CCU floor being trained on a new computer system and the nursing staff could not effectively attend to patient needs while simultaneously receiving the computer training.

32.    Typically, the policy for patients admitted to CCU states that patients should be seen "within a reasonable time" after admission.

33.    A member from the nursing staff called Dr. Davis; however, since this patient was placed in the CCU per the request of Bill Bledsoe, Dr. Davis decided to see Patient A the following morning instead of seeing Patient A that night.

34.    The Nursing staff was not aware that Patient A was not admitted to CCU because of a medical condition.  The nursing staff called Dr. Davis again, and later called the nursing supervisor to contact Dr. Davis.

35.     Patient A was transferred to the regular floor and seen by Dr. Davis the following morning.

36.     Patient A was transferred back to the CCU on August 30, 2007, three days later, after suffering from ventricular tachycardia on the floor.

37.     Dr. Davis was never invited to a committee meeting or interview to discuss Patient A by the Medical Care Review Committee.

38.     In September 2005 Dr. Reid Pierce, then Chief of Staff, requested that Dr. Davis write a history and physical for Patient A who was admitted to the CCU at the convenience of the hospital.

39.     Dr. Davis reported that he had already performed a history and physical on Patient A.  Dr. Davis declined to write a summary on the chart and stated that the chart itself noted the treatment plan.

40.     At the time Dr. Reid Pierce talked to Dr. Davis about this issue he did not lodge a complaint or impose any disciplinary action against Dr. Davis at that time, nor did Dr. Reid Pierce refer this alleged incident to the Credentials Committee.  No action was taken against Dr. Davis more than two years after Patient A's admission to the hospital.

41.     Dr. Reid Pierce while Chief of Staff had the ability and the authority to discipline Dr. Davis for any behavior he deemed unprofessional or in violation of JRMC Medical Staff By-Laws, JRMC Medical Staff Rules and Regulations, and JRMC Code of Conduct Policy.

42.     Dr. Reid Pierce took no actions whatsoever for the alleged incident of Dr. Davis becoming irate during a conversation in Dr. Reid Pierce's office.  Instead, Dr. Pierce waited 7 months later – March 2006, after he was no longer Chief of Staff, to create a summary of the alleged September 2005 conversation with Dr. Davis in which Dr. Davis allegedly became irate.

43.     Dr. Reid Pierce did not provide Dr. Davis with a copy of this summary, nor was Dr. Davis given an opportunity to respond to the accusation.

44.     On November 10, 2005 Dr. Charlie Mabry, Director of Quality Management, requested a meeting with Davis to discuss the above referenced Case.

45.     During the meeting Dr. Charlie Mabry requested Dr. Davis to write a summary on the chart and history and physical.

46.     Dr. Reid Pierce showed up unannounced to the meeting and Dr. Davis asked him to leave.

47.     In that meeting Dr. Mabry and Dr. Reid Pierce threatened Dr. Davis with sanctions via the Arkansas Foundation for Medical Care.

48.     On November 11, 2005 Dr. Davis questioned Dr. Mabry about why Dr. Mabry made false assertions in the Patient A case and Dr. Davis also questioned Dr. Mabry's failure to review the medical chart prior to calling him in for collegial intervention.

49.     Dr. Davis also accused Dr. Mabry and Dr. Reid Pierce of bias and racial discrimination.  Dr. Davis sent his concerns about Dr. Mabry's and Dr. Reid Pierce's bias and racial discrimination to Tom Harbuck, Executive Vice President, Robert Atkinson, CEO, Jefferson Hospital Association, and Bill Bledsoe, Cardiac Administrator, via a Quality Concern.

50.     On November 21, 2005 Dr. Davis met with Morie Mehyou, Asst. Vice President of Information Management and Decision Support.  Mr. Mehyou alleged that Dr. Davis used profanity.

51.     A collegial intervention was held on November 22, 2005 in which this issue was addressed and resolved.

52.     Dr. Davis then had a meeting with Robert Atkinson to reiterate his concern that Dr. Mabry and Dr. Reid Pierce were showing bias against him and that they were discriminating against him on the basis of his race.

53.     Mr. Atkinson relayed Dr. Davis' concerns of discrimination and bias to Dr. Mabry for further investigate and answer.

54.     Dr. Mabry investigated himself and Dr. Reid Pierce and found no bias or discrimination.

55.     Later Dr. Davis met with Mr. Atkinson and discussed Dr. Mabry's findings from the Patient A case.

56.     Dr. Mabry's report contained multiple factual errors.

57.     Dr. Davis requested that Mr. Atkinson have another physician review Dr. Mabry's response on the Patient A case.  Mr. Atkinson refused to have additional reviews performed and informed Dr. Davis that he should address his complaints to Medical Care Review Committee.

58.     During 2005, but prior to experiencing acts that were biased and discriminatory against Dr. Davis from Dr. Mabry and Dr. Reid Pierce, Dr. Davis was considering entering into a joint venture as a member of a group of doctors with JRMC.

59.     On December 28, 2005 Dr. Davis sent a letter to Mr. Atkinson declining to join the joint venture due to Mr. Atkins' unwillingness to perform any more than a perfunctory inquiry of Dr. Davis' complaints of bias and discrimination concerning the behavior of Dr. Reid Pierce and Dr. Mabry.

60.     On January 25, 2006 Dr. Davis was involved in an incident with 3NW nursing staff (Sandra Morgan).  Dr. Davis was accused of using profanity and being disruptive with the nursing staff.

61.     Dr. Davis denied using profanity and several of the nurses on the floor that witnessed the incident agreed that Dr. Davis did not use profanity.  These nurses were African American.

62.     Several other nurses stated that Dr. Davis did indeed use profanity.  These nurses were all Caucasians.  Six white nurses signed a complaint alleging that Dr. Davis used profanity and Bill Bledsoe found that some of the nurses told different versions of the incident.

63.     None of the black nurses present at the altercation were interviewed.  Upon information and belief, Louise Hickman (white female), director of nursing suppressed findings.

64.     Upon information and belief Nurse, Sandra Morgan was instructed by the administrative nurse, Brixey to write a report of the incident adverse to Dr. Davis.

65.     Sandra Morgan later stated that she did not want to write up the incident and that she had previously had worse incidents involving other physicians.

66.     Upon information and belief On January 26, 2006 Dr. Reid Pierce was seen showing Sandra Morgan's write up of the incident with Dr. Davis to Dr. James Campbell and Dr. John Busby prior to any investigation being initiated.

67.     Dr. Davis complained to Dr. Greene, Chief of Staff, and hospital administration about Dr. Reid Pierce's behavior.  Dr. Reid Pierce was the Director of Credentials at the time of this incident.  Dr. Greene took no action against Dr. Reid Pierce for violating the hospital's confidentiality policy.

68.     On January 26, 2006 Dr. Green called Dr. Davis for a collegial intervention on the Sandra Morgan incident prior to any investigation being performed.

69.     Dr. Davis informed Dr. Green that the complaint contained factual errors and asked Dr. Green to investigate the case.

13

70.     Dr. Davis was never informed of Dr. Green's findings in the case.

71.     Dr. Davis agreed that the use of profanity was not appropriate but denied the allegation that he, in fact, used profanity during the incident with Sandra Morgan. This was the last collegial intervention for any behavior issues concerning Dr. Davis.

72.     On February 10, 2006 Dr. Green and Dr. Reid Pierce sent a letter to Dr. Davis and Nurse Wendell Johnson placing moratorium on Wendell for performing cardioversion and conscious sedation due to the Patient B Case.

73.     Dr. Davis and Wendell Johnson defended the allegations made in the Patient B case and supported their assertions that nurse Johnson was acting within the scope of his practice by stating the actions Wendell Johnson had performed and attaching a copy of the Clinical Guidelines for Non-Hospital Employed Allied Health Personnel to support Wendell Johnson's practices.

74.     On February 14, 2006 Dr. Davis wrote a letter to Mr. Atkinson again stating that Dr. Mabry and Dr. Pierce were discriminating on the basis of his race in their actions against Dr. Davis in that Dr. Davis was being unreasonably restricted in the use of his Allied Health Professional (nurse), and that Dr. Davis was being more harshly scrutinized for the timeliness of completing his medical records when other Caucasian medical staff members have similar timeliness issues and are informed of these issues through the use of Medical Staff Rules and Regulations and are not reported to the Credentials Committee for investigation.

75.     Dr. Davis received a letter from Mr. Atkinson to Dr. Davis stating that Dr. Davis' complaints of racial discrimination and bias by Dr. Reid Pierce and Dr. Mabry was a medical staff issue.

76.     On March 8, 2006 Mr. Mehyou wrote a memorandum outlining a policy of notification for physicians under review by the Quality management Department.   This memorandum was a restatement of JRMC's existing policy for physician notification of reviews.

77.     Dr. Davis was not notified of investigations involving Patients A, B, C or D prior to Dr. Davis appearing before the ad hoc investigative committee.

78.     Dr. Davis also reported to the committee that his cases were being reviewed to a greater extent without his knowledge.

79.     On March 9, 2006 Dr. Davis wrote a letter to Dr. Green reporting that Dr. Reid Pierce attempted to solicit sexual harassment complaint from nursing student.

80.     Dr. Pierce acknowledged soliciting a sexual harassment complaint against Dr. Davis from a nursing student.

81.     On March 15, 2006 Dr. Green wrote a letter supporting Dr. Reid Pierce's attempts to solicit a sexual harassment complaint against Dr. Davis.

82.     Dr. Green acknowledges that there was not a written complaint filed by Goodlow or her supervisor as required by hospital policy before an investigation is initiated.

83.     On March 24 2006 Dr. Green wrote another letter to Dr. Davis reporting that Mr. Atkinson supports Dr. Reid Pierce's attempts to solicit sexual harassment complaint against Dr. Davis.

84.     The nursing student denied being sexually harassed or any inappropriate behavior by Dr. Davis.On May 15, 2006 Dr. Davis received a letter from Dr. Lupo informing him that an investigation into his behavior was initiated by resolution of the Credentials Committee.

85.     Behavior issues of the medical staff were to be specifically addressed and resolved through collegial intervention and if no resolution was possible through the collegial

intervention, the matters were to be directed to the Medical Executive Committee pursuant to the Medical Staff Code of Conduct.

86.     Dr. Davis' alleged behavior issues should not have been before the Credentials Committee and suspension of his medical staff privileges should not have been considered.

87.     White physicians have not been subjected to Credentials Committee investigation for behavioral issues not involving quality patient care issues.

88.     On May 25, 2006 Dr. Davis wrote a letter to Dr. Lupo asking him to enumerate the specific allegations brought against him and the information used to support those allegations.

89.     On May 31, 2006 Dr. Pierce informed Dr. Davis that the file used for the Ad hoc Investigative Committee to make its recommendations was available for review. Dr. Davis was told that he could only view the information in the presence of Dr. Reid Pierce, Dr. Green or Dr. Lupo.

90.     Dr. Davis was not provided an adequate opportunity to review the information because Dr. Lupo and Dr. Green regularly made themselves unavailable.

91.     JRMC's custom for a member of the medical staff to review their personnel and confidential file prior to May 31, 2006 had been that any staff member of the medical records department could provide supervision when a member of the medical staff was reviewing their personnel and confidential files.

92.     The file that Dr. Davis was eventually allowed to review was only his personnel file, which did not contain any of the investigative information that the Ad hoc Investigative Committee used in conducting its investigation.

16

93.     On June 2, 2006 Dr. Lupo informed Dr. Davis that the file used in the Ad hoc Committee investigation was available for supervised review.

94.     Dr. Lupo and Dr. Green made themselves unavailable and difficult for Dr. Davis to see his file.

95.     Upon information and belief, Dr. Lupo and Dr. Green never reviewed Dr. Davis' regular charts.

96.     After seeing his complete file at the July Investigative meeting, Dr. Davis realized that many of the documents used in the investigation were not available during his short 30-minute review of his personnel file the day prior to the meeting with the Ad hoc Investigative Committee.

97.     On June 22, 2006 Dr. Davis met with the Credentials Committee to discuss the behavior issues and other allegations that eventually formed the basis for the Corrective Action Plan that was administered against Dr. Davis.

98.     On July 11, 2006 Dr. Davis received a letter from Dr. Lupo informing him of the provisions created by the Credentials Committee to monitor and control Dr. Davis' behavior and with which Dr. Davis was to comply with in order to maintain his appointment on the medical staff at JRMC. The letter provided that Dr. Davis could schedule a time to review the provisions of the Corrective Action Plan.

99.     Dr. Davis made several attempts to schedule a time to review the provisions; however, he was not afforded the opportunity to review the provisions prior to the July 17, 2006 Credentials Committee meeting due to Dr. Lupo's unavailability.

100.    Dr. Davis refused to sign the provisions and requested process to appeal the imposition of the provisions.

17

101.   Dr. Davis was told by Dr. Lupo that the provisions could not be appealed.

102.   White physicians facing conduct issues have not been subject to Corrective Action Plans or to similar investigations by the Credentials Committee.

103.   The unreasonable, discriminatory, and unnecessarily restrictive Corrective Action Plan that the Credentials Committee imposed on Dr. Davis contained a "no tolerance" provisions for sexual harassment when Dr. Davis had not engaged in any sexual harassment as defined by hospital policy.

104.   Dr. Davis was forced to submit to random drug screening by the Hospital's Employee Health Nurse to maintain his medical staff privileges when there were no complaints of Dr. Davis' possible drug use, nor was there any investigation into any suspected drug use by Dr. Davis. This provision was unreasonable under the circumstances.

105.   White physicians have not been subject to random drug testing without cause or under the same or similar circumstances.

106.   The Corrective Action Plan was devised to address the alleged behavioral and conduct issues of Dr. Davis and was used as a pretext to revoke Dr. Davis' medical staff privileges. The provisions were so restrictive that any violation of any provision would result in revocation.

107.   A written form was developed by the Credentials Committee as a tool for interviewing the hospital nursing staff to assist in monitoring Dr. Davis' conduct under the Corrective Action Plan.

108.   The form was designed to elicit adverse complaints against Dr. Davis while allowing any unprofessional conduct by other medical staff members to remain anonymous and go unchecked.

18

109.   White physicians have not been subject to such under the same or similar circumstances.

110.   The Corrective Action Plan called for Dr. Davis to show a pattern of improvement in professional behavior, a pattern and trend of improvement in compliance with all medical records, and strict compliance with the stated attendance requirement at committee meetings and the drug-screening requirement.

111.   On December 18, 2006 the Credentials Committee voted unanimously to recommend suspension of Dr. Davis' medical staff privileges based on behavioral and conduct allegations..

112.   On December 21, 2006 Counsel for Jefferson Hospital Association, Rick Beard, requested that the Credentials Committee to table the suspension of Dr. Davis' medical staff privileges until the first of the new year, and but for intervention of counsel, the recommendation would have been recommended to the CEO, Robert Atkinson.

113.   In the Invasive Care Committee meeting held on March 5, 2007 Dr. Davis was advised that physician reviewers and those undergoing the review may discuss peer reviews.

114.   In a letter written by Dr. Lupo to Cindy Livingston, Credentials Coordinator on March 19, 2007 Dr. Lupo stated that Dr. Davis' comments to Dr. Lupo that Dr. Lupo "should resign" is a violation of Dr. Davis' Corrective Action Plan and asked that a complaint of the incident be placed in Dr. Davis' file. Dr. Davis was not notified that such a letter was added to his file.

115.   On March 19, 2007 Dr. Davis received a letter from Dr. Lupo informing him that the Credentials Committee had voted unanimously by resolution to initiate an investigation into whether Dr. Davis violated the provisions of the his 2006 Corrective Action Plan.

116.    On March 29, 2007 Dr. Green wrote a letter to Davis asking for information on the Patient E case.

117.    Dr. Green implied that the Arkansas Foundation for Medical Care had concerns about the standard of care rendered by Dr. Davis.  The letter from Arkansas Foundation for Medical Care made no mention of the standard of care provided by Dr. Davis.

118.    Dr. Davis was not provided a copy of the original Arkansas Foundation for Medical Care letter despite his request to be provided one in order to respond appropriately to the issues raised in the letter.

119.    This caused the delay in Dr. Davis providing a written response to the committee. Dr. Davis' response was provided to Dr. Green on May 11, 2007; nineteen (19) days before the Credentials Committee cited Dr. Davis for not providing the information.

120.    On May 1, 2007 Dr. Mabry wrote letter to Dr. Green requesting that Dr. Davis be removed from the Invasive Procedure Committee.

121.    On May 3, 2007 Dr. Green informed Dr. Davis by letter that he had been removed from the Invasive Procedure Committee for allegedly violating the committee's confidentiality agreement without adequate investigation into allegations allegedly made against Dr. Davis.

122.    White physicians have not been subject to such treatment under the same or similar circumstances.

123.    On May 21, 2007 Dr. Davis met with the Ad hoc Committee.  The committee did not discuss any specific charges or allegations against Dr. Davis, nor was Dr. Davis informed that there were any of his patient's medical charts being reviewed for his substandard patient care issues.

124.    On May 30, 2007 the Ad hoc Committee recommended that Dr. Davis' medical staff privileges be suspended.

125.    The Credentials Committee accepted the recommendation of the ad hoc investigative committee and recommended the suspension of Dr. Davis' medical staff privileges to the Board of Directors.

126.    The Credentials Committee's recommendation to suspend the medical privileges of Dr. Davis included information of over utilization, failure to medically treat patients, deficient medical record information, and increased mortality data from the medical charts of nine of Dr. Davis' patients, which were reviewed internally.

127.    On May 31, 2007 Robert Atkinson, President and CEO of JRMC, received a written request from Dr. Davis for hearing to appeal the Credentials Committee recommendation to suspend Dr. Davis' medical staff privileges.

128.    On June 12, 2007 Robert Atkinson hand delivered a written response acknowledging receipt of Dr. Davis' request for hearing.  This written communication also contained a notice that the hearing would be held on July 18, 2007.

129.    The written communication also contained a list of witnesses that could possibly be called to offer testimony or present evidence in support of the Credentials Committee recommendation; the names of the individual members composing the hearing panel; and a reference to a May 30, 2007 letter sent to Dr. Davis enumerating reasons for the recommendation of the Credentials Committee.

130.    The letter did not contain a list of the patient records and information supporting the Credentials Committee recommendation as required by Article 6.2-3(a)(iv) of the Medical

Staff Credentials Policy.  Finally, the letter contained the name of the Presiding Officer of the Hearing Panel.

131.    On June 27, 2007 counsel objected to JRMC's unilateral appointment of William C. Bridgforth as Presiding Officer over Dr. Davis' appeal hearing.

132.    The grounds for the objection were that the presiding officer and the hearing officer's wife at the Fair Hearing had a fatal appearance of bias caused by a financial conflict of interest.

133.    JRMC unilaterally selected and paid Mr. Bridgforth and his future employment in the capacity of a presiding officer was entirely dependant on the goodwill of JRMC.

134.    Counsel for Dr. Davis recommended conferring with JRMC in an attempt to agree on a hearing officer who has no direct or indirect ties with JRMC to ensure a fair and impartial hearing for both parties.  This offer was refused.  The appearance of bias necessitated that Mr. Bridgforth be disqualified because he was unilaterally selected and paid by JRMC, and it was foreseeable that JRMC would use Mr. Bridgforth as a hearing officer in the future.

135.    Dr. Davis also objected to the selection members of the hearing panel on similar grounds of economic conflict.

136.    Four of the five members of the hearing panel derived a substantial portion of their income from JRMC either directly or indirectly and this created an irreconcilable economic conflict and compelled their disqualification.

137.    On July 9, 2007 Dr. Mabry provided a power point presentation to the Credentials Committee that included the results of at least one of the conclusions of an outside reviewer and Dr. Davis was not notified that any of his cases had been selected for an outside review, which was a violation of hospital committee policy.

138.   The Credentials Committee considered such reviews without Dr. Davis having an opportunity to submit any rebuttal reviews for the Credentials Committee to consider.

139.   On July 10, 2007 at approximately 4 p.m. the outside review of Dr. Glassman was given to Dr. Davis and Dr. Davis was requested to defend those cases reviewed by Dr. Glassman in front of the Credentials Committee on July 12, 2007 at 6p.m.

140.   Dr. Davis informed Julie Kurthausen that he would not be present at that meeting because he needed sufficient time to examine the external reviews of Dr. Glassman to adequately prepare to defend his treatment in those cases and to obtain copies of the charts at issue.

141.   On July 11, 2007 Counsel for Dr. Davis made a written request of Dr. Lupo for more time to prepare for the hearing before the Credentials Committee.  This request was denied and Dr. Davis then declined a voluntary suspension of his cath lab privileges.

142.   On July 12, 2007 Counsel for Dr. Davis sent the Credentials Committee the report of Bruce Murphy, Chief of Medical Staff, Arkansas Heart Hospital who evaluated the four charts sent by the Credentials Committee for outside review.

143.   Dr. Murphy's report was provided prior to the Credentials Committee meeting and their issuing the precautionary suspension.

144.   Dr. Murphy's reviews were highly supportive of Dr. Davis' treatment in the four cases and Dr. Murphy found Dr. Davis' treatment and care to be appropriate in each case.

145.   On July 12, 2007 the Credentials Committee met without Dr. Davis being present and voted unanimously to recommend a precautionary suspension on all of Dr. Davis' medical staff privileges at JRMC.  The precautionary suspension was administered to Dr. Davis on July 13, 2007 by the credentials Committee.

146.    In a letter dated July 13, 2007 from Dr. Lupo, Chairman of the Credentials Committee, to Mr. Atkinson, CEO of JRMC; the Credentials Committee advised Mr. Atkinson that a suspension of Dr. Davis' medical staff privileges was "not only appropriate and necessary but that a failure to suspend Dr. Davis would result in an imminent danger to the health and/or safety of the patients to whom Dr. Davis provided cardiology services."

147.    Dr. Lupo acknowledged in a July 13, 2007 letter to Mr. Atkinson that the Credentials Committee only considered the information from the outside reviewers retained by JRMC and the presentations made by Dr. Mabry, Director of Quality, which contained incomplete and inaccurate information on Dr. Davis' patients medical charts, in addition to misrepresented mortality rate calculations that did not make the proper risk adjustments according to the recommended and accepted standards for determining mortality rates.

148.    Dr. Mabry's power point presentation included information on nine (9) deaths attributed to Dr. Davis' failure to provide appropriate care to several older patients and other allegations of misconduct.

149.    The Credentials Committee used the information from the outside reviewers retained by JRMC and Dr. Mabry's power point presentation as the basis for its recommendation for the suspension of Dr. Davis' medical staff privileges.

150.    On July 16, 2007 Counsel for Dr. Davis requested Dr. Lupo reinstate Dr. Davis' privileges after receipt of Dr. Murphy's reviews supporting Dr. Davis' treatment.

151.    On July 19, 2007 in a meeting with Credential Committee to discuss Dr. Davis' cases that were sent out for external review.  The only issues discussed at this meeting were the four cases sent out for external review.

24

152.    Dr. Davis requested copies of the mortality rate information and Dr. Lupo stated that there was no mortality information.  Dr. Davis provided copies of Dr. Murphy's and Dr. Bissett's reviews (external reviewers obtained by Dr. Davis) to each member of the committee.

153.    Dr. Davis also provided each member of the Credentials Committee a summary of the factual errors that he deemed to be mistakes that were made in the external reviews given by Glassman and Henderson (external reviewers retained by JRMC).

154.    Dr. Davis provided a risk adjustment chart for calculating mortality rates to Credential Committee from the Mayo Clinic.

155.    Each of the Credentials Committee members had previously been provided a copy of Dr. Mabry's power point presentation; however, Dr. Davis was never provided a copy for review, and therefore, unaware that such mortality rate calculations were inaccurate and not calculated by the recommended and accepted method of determining mortality rates.

156.    Dr. Davis received a letter from Mr. Atkinson on July 23, 2007 notifying Dr. Davis that the Credentials Committee recommended revocation on July 19, 2007 meeting.

157.    The letter also informed Dr. Davis of his right to request a hearing on the adverse recommendation of the Credentials Committee within thirty (30) days pursuant to Article 6.2-1(b) and 6.2-2 of the Medical Staff Credentialing Policy.  Dr. Davis timely requested a hearing pursuant to Article 6.2-2 of the Medical Staff Credentialing Policy.

158.    Dr. Davis was not provided a statement of the specific reasons for the recommendation pursuant to the requirements of Article 6.2-3 of the Medical Staff Credentialing Policy, nor was Dr. Davis provided a list of the patient records and information supporting the recommendation.

159.   The Credentials Committee and the JRMC Board of Directors' failure to provide this information to Dr. Davis was a violation of Article 6.2-3 of the Medical Staff Credentialing Policy and significantly diminished Dr. Davis' ability to prepare to defend the findings of the Credentials Committee.  Further, the Credentials Committee and the JRMC Board of Directors denied Dr. Davis the due process provided for under the policy.

160.   On July 24, 2007 Dr. Davis was removed from the APPO network due to the loss of privileges at JRMC.  The resulting loss of patients following Dr. Davis' removal from APPO care caused great pecuniary loss to Dr. Davis' cardiology practice.

161.   On August 16, 2007 Dr. Davis received notice that he had been reported to the National Practitioner's Data Bank by JRMC.

162.   Also in August 2007 the Board of Directors vote to extend precautionary suspension based o mortality data and the outside reviews of the four cases.

163.   White physicians under precautionary suspension have not been reported by JRMC to the National Practitioner's Data Bank until after final action by the Board of Directors.

164.   On August 16, 2007 counsel for Dr. Davis requested from counsel for JRMC specific information to which Dr. Davis is entitle pursuant to Article 6.3-1.

165.   Article 6.3-1(a) mandates that Dr. Davis be entitled to all patient medical records referred to in Article 6.2-3(iv) and any other documents relied upon by the Credentials Committee in making the recommendation to suspend the medical staff privileges of Dr. Davis.

166.   JRMC failed to provide medical records and information to support their claims of delinquent and deficient medical charting beyond March 2007 and stated that all such records were unintentionally lost.

167.    Counsel for Dr. Davis was denied this request by counsel for JRMC in a letter dated August 30, 2007, which stated that JRMC was not obliged to respond to the request. JRMC's failure to provide information specifically requested by Dr. Davis and mandated by Article 6.3-1(a) was a clear violation of the Medical Staff Credentialing Policy and further denial of Dr. Davis' due process rights as enumerated by the Medical Staff Credentialing Policy.

168.    On June 26, 2008 Board of Directors of Jefferson Hospital Association voted to accept the recommendation of the Hearing Review Panel and revoked Dr. Davis' hospital privileges.

169.    Dr. Davis was notified by written communication on July 3, 2008 that his privileges were immediately revoked. The written communication also provided Dr. Davis notice that JRMC would send notice of the revocation of his privileges to the National Practitioners Data Bank.

**V.**
**CAUSES OF ACTIONS**

**COUNT 1**
**VIOLATION OF 42 U.S.C. § 1981**
**DISCRIMINATION ON THE BASIS OF RACE**
**(All Defendants)**

170.    The statements and allegations contained in paragraphs 1-169 of this Original Complaint are incorporated by reference as if fully set out word for word.

171.    Defendants are liable individually, jointly and severally pursuant to 42 U.S.C. § 1981 for discriminating against Dr. Davis in the making, performance and enforcement of his contractual relationships with his patients because of his race.  Dr. Davis is Black.

## COUNT 2
### VIOLATION OF 42 U.S.C. § 1983
### DISCRIMINATION ON THE BASIS OF RACE
### (All Defendants)

172.    The statements and allegations contained in paragraphs 1-171 of this Original Complaint are incorporated by reference as if fully set out word for word.

173.    Under Arkansas and federal law, an employer may not lawfully violate 42 U.S.C. § 1983 or the Arkansas Civil Rights Act by subjecting such an employee to a work environment that is hostile because of Plaintiff's race.  Further, an employer may not violate 42 U.S.C. § 1981 or the Arkansas Civil Rights Act by discharging an employee, even an at-will employee, for a racially discriminatory reason.

174.    Defendants are liable individually, jointly and severally pursuant to 42 U.S.C. § 1981 for subjecting Dr. Davis to a hostile working environment, which included but is not limited to, the implementation of an unreasonable and unduly restrictive Corrective Action Plan, and by summarily suspending his medical staff privileges at the hospital in violation of his rights to equal protection and by failure to renew his medical staff privileges based on his race.  JRMC took these actions without affording Dr. Davis due process as provided for under JRMC Medical Staff Credentialing Policy.

## COUNT 3
### VIOLATION OF DUE PROCESS
### (JRMC)

175.    The statements and allegations contained in paragraphs 1-174 of this Original Complaint are incorporated by reference as if fully set out word for word.

176.    Defendants' policy and practice of failing to provide Dr. Davis with a Presiding Officer for his appeal that is free from the fatal appearance of bias due to his wife's long-standing employment relationship with JRMC violates the Due Process Clauses of the Fifth and

Fourteenth Amendments to the United States Constitution.   Further, Defendant's failure to provide Dr. Davis with a hearing panel that is free from the fatal appearance of bias due to the fact that four of the five member panel derived substantial income from JRMC violates the Fifth and Fourteenth Amendments to the United States Constitution.   JRMC's failure to comply with its own by-laws, rules and regulations regarding notice and disclosure of information to Dr. Davis denied Dr. Davis of the contractual due process rights afforded by such by-laws, rules and regulations and also denied Dr. Davis of those due process rights guaranteed under the Fourteenth Amendment of the United States Constitution.

177.   Plaintiff's damages were proximately caused by the actions of Defendants.

## COUNT 4
## VIOLATION OF 42 U.S.C. § 1985(3)
## CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS
## (All Defendants)

178.   The statements and allegations contained in paragraphs 1- 177 of this Original Complaint are incorporated by reference as if fully set out word for word.

179.   Defendants are liable individually, jointly and severally pursuant to 42 U.S.C. § 1985(3) for conspiracy with the intent and purpose of depriving Black persons, either directly or indirectly, of the equal protection of the laws, or of equal privileges and immunities of the laws and for acting in furtherance of said conspiracy to injure Dr. Davis by depriving him of his property right to engage in the practice o medicine and for violating and conspiring to violate Dr. Davis' rights guaranteed by the United States Constitution by depriving him of equal protection of the laws by applying standards to him different from those applied to other similarly situated white physicians.

29

**COUNT 5**
**VIOLATION OF FEDERAL HEALTH CARE QUALITY**
**IMPROVEMENT ACT**
**(All Defendants)**

180.    The statements and allegations contained in paragraphs 1-179 of this Original

Complaint are incorporated by reference as if fully set out word for word.

181.    The Health Care Quality Improvement Act ("HCQ Act"), which is designed to

encourage physicians to engage in reviews of their peers, permits immunity to attach to such

review activities provided the reviews meet procedural requirements.  In order to be entitled to a

presumptive immunity under the HCQ Act, Defendants must meet the four requirements of the

Act, which include the requirement that (1) the review action was taken in the reasonable belief

that the action was in the furtherance of quality health care; (2) after reasonable effort to obtain

facts of the matter under review; (3) after adequate notice and hearing procedures were afforded

to the physician or after such other procedures as were fair to the physician under the

circumstances; and (4) in the reasonable belief that the action was warranted by facts known

after such reasonable effort to obtain facts and after such adequate procedures.  42 U.S.C. §§

11111(a)1, 11112(a).

182.    In the instant case, the Defendants forfeited the immunity under the HCQ Act

because their actions were not taken in the reasonable belief that their actions were in furtherance

of quality health care but rather their actions were taken to retaliate against Dr. Davis for the

following: (1) Dr. Davis' filing a quality control complaint against Dr. Mabry; (2) Dr. Davis

filing a complaint of bias and discrimination against Dr. Reid Pierce and Dr. Mabry; and (3) Dr.

Davis declining to accept an offer of a joint venture with JRMC for ownership of Dr. Davis'

lucrative cardiology practice.

183.   The reviews of patient charts were supervised by physician reviewers that Dr. Davis had filed grievances against in the past and they did not conduct an adequate investigation in that they failed to make a reasonable effort to obtain the true facts of the cases they investigated.   Many of the doctors, nurses, medical technicians, and hospital visitors that witnessed some of the alleged incidents of wrong doing by Dr. Davis were never interviewed during the investigation of these alleged incidents. A reasonably objective investigation should consider the eye witness accounts of third parties. Further, a reasonably objective investigation of Dr. Davis' patient charts would have revealed that Dr. Davis was caring for his patients within the prescribed standard of care.

184.   Dr. Davis was not given a statement of the specific reasons for the recommendation against him, nor was he given the list of patient records and information supporting the recommendation. Further, neither Dr. Davis, nor his counsel were given sufficient time, (up to thirty (30) days), to rebut the information that he finally received. Prior to the hearing before the Credentials Committee Dr. Davis was granted a sham thirty-minute review of his personnel file that was restricted to being viewed only in the presence of Dr. Lupo, Dr. Green, or Dr. Reid Pierce. This file did not contain information about the investigation performed by the Ad hoc investigative committee relating to the quality of care that Dr. Davis was providing for his patients.   Finally, the ad hoc investigative committee interviewed Dr. Davis as a part of their investigation; however, he was never informed of the general nature of the evidence supporting the investigation.

185.   The Defendants acts of bad faith was demonstrated by the fact that their reviews were based on an arbitrary standard of review as opposed to authoritative standards of review and the reviews were replete with misrepresentations, inaccuracies, incomplete information, and

misstatements.   The Defendants failed to interview or confer with Dr. Davis before they administered the precautionary suspension of all of his hospital privileges.  No consideration was given to Dr. Davis' opinion before suspending all of his privileges nor did the ad hoc investigative committee contain a cardiologist to aid in the investigation.

186.   Dr. Mabry and Dr. Pierce admitted during oral deposition that they failed to consider Dr. Davis' opinion.  Defendants acted out of bias and discriminated against Dr. Davis on the basis of his race to get Dr. Davis removed from the hospital medical staff.   Defendant, Dr. Mabry knowingly presented incomplete and inaccurate medical charts to biased, outside reviewers.  Further, Dr. Mabry acknowledged providing each outside reviewer with copies of prior internal reviews of the same medical charts thereby biasing the opinions of such external reviews.  Dr. Mabry also presented inaccurate statistical data on mortality rates adverse to Dr. Davis to the Credentials Committee with the clear intent to misrepresent Dr. Davis' mortality rate and result in the suspension of his medical staff privileges.  The various reviews conducted by the Defendants were so patently defective and erroneous that it was not reasonable for JRMC to rely on them as the basis for the precautionary suspension.

187.   Defendants forfeited their immunity under the Health Care Quality Improvement Act because their efforts to obtain the facts of the matter under review were not reasonable, nor were the hearing procedures fair to Dr. Davis under the circumstances.  Further, Defendants acted with actual malice – actual knowledge of the falsity or in the reckless disregard of the falsity of the allegations against Dr. Davis.  Defendant's malice is documented in the following and other ways:

i.      In summarily suspending Dr. Davis' medical staff privileges at JRMC without a reasonable effort to obtain the facts, without adequate notice and process, and in conducting the investigation in violation of the JRMC governing hospital law.

ii.      In conducting a limited and biased by reviewers selected by Dr. Mabry and Dr. Pierce, against whom Dr. Davis had filed complaints of bias and racial discrimination prior to the ad hoc committee investigation, and conducting the reviews with medical staff members who were not qualified to perform the reviews and should not have been allowed to perform the reviews;

iii.      In including in the case against Dr. Davis cases already reviewed and cleared by the Invasive Procedure Committee that were used as the basis of the action against Dr. Davis;

iv.      Defendants did not act in the interest of the furtherance of health care but out of a discriminatory and biased desire to have Dr. Davis removed from the medical staff of JRMC;

v.      Defendants' malice is also documented in intentionally and knowingly providing false, misleading and inaccurate summaries of Dr. Davis' cases by the biased and racially discriminatory reviewers or their proxies;

vi.      In having reviews of Dr. Davis' patient charts by persons in direct economic competition with Dr. Davis;

vii.      In presenting false, inaccurate, incomplete and/or misleading testimony to the Credentials Committee and the peer review panel.

viii.      By referring behavioral issues to the Credentials Committee when those issues should have been referred to the Medical Executive Committee;

ix.     By the Credentials Committee voting to suspend Dr. Davis' medical staff privileges in 2006 on allegations of behavioral misconduct only;

x.     By developing a Corrective Action Plan specifically targeted toward Dr. Davis for alleged conduct common among other physicians.

188.    As a result of the foregoing, Dr. Davis seeks a declaration that the Defendants are not entitled to immunity under federal or state law.

**COUNT 6**
**RETALIATION**
**(All Defendants)**

189.    The statements and allegations contained in paragraphs 1-188 of this Original Complaint are incorporated by reference as if fully set out word for word.

190.    As the direct result of Dr. Davis' complaint to JRMC of quality concerns against Dr. Mabry, and Dr. Pierce, Dr. Davis was improperly investigated in violation of the JRMC Bylaws; specifically, the JRMC Medical Staff Code of Conduct; the JRMC Medical Staff Rules and Regulations; and the JRMC Medical Staff Credentialing Policy; and Dr. Davis was called up for review in violation of the Health Care Quality Improvement Act.

191.    As the direct result of complaining to JRMC about his disparate treatment compared to non-minority doctors, Dr. Davis was discriminated against on the basis of his race; and subsequently had his medical staff privileges suspended in violation of 42 U.S.C. §§ 1981, and 1983.

192.    Dr. Davis' damages related to Defendants' retaliatory actions are proximately caused by Defendants' retaliatory actions.

## COUNT 7
## TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY
### (All Defendants)

193.    The statements and allegations contained in paragraphs 1-192 of this Original Complaint are incorporated by reference as if fully set out word for word.

194.    The precautionary suspension and summary suspension of Dr. Davis' medical staff privileges through the actions of the Defendants and the publication of the suspensions to the National Practitioner's Data Bank and the Arkansas Medical Association constitutes tortuous interference with Dr. Davis' business, more particularly, with his patients.

195.    The suspension of Dr. Davis and the publication of such to members of the medical staff, protected no legitimate business interest of the Defendants

196.    The suspension and the publications improperly influenced other hospitals, physicians, patients and other healthcare organizations not to deal with Dr. Davis.

197.    The actions of the Defendants interfered with Dr. Davis' business with JRMC and Dr. Davis' patients by preventing Dr. Davis from seeing patients at JRMC and effectively halting Dr. Davis' practice of medicine at JRMC.   Dr. Davis has been damaged in lost business reputation, loss of medical fees, goodwill and lost future employment in an amount exceeding the minimum Federal jurisdictional amount in diversity actions ($75,000.00).

198.    The acts, statements, determinations, and recommendations made and acts reported by the Defendants as described herein, were undertaken with malice and with the intention of preventing the contractual relationships between Dr. Davis and his patients, as well as the contractual relationships with referring doctors, from occurring.   These actions were undertaken for the purpose of harming Dr. Davis.   Dr. Davis' business would not have been lost

35

and Dr. Davis would have obtained substantially greater business, in the absence of Defendant's interference.

199.   As a direct result of the Defendants' interference with Dr. Davis' business, Dr. Davis has suffered and will continue to suffer actual damages including damages for lost profits, loss of past and future earnings and/or earning capacity.  Further, for the reasons more fully set out above, Dr. Davis is entitled to recover exemplary and punitive damages.

200.   The acts of Defendants constitute a State Law claim of Tortious Interference with his Business Expectancy, in violation of State public policy.

201.   Dr. Davis' damages for this Count were proximately caused by Defendants.

**COUNT 8**
**VIOLATION OF ARKANSAS CIVIL RIGHTS ACT**
**(All Defendants)**

202.   The statements and allegations contained in paragraphs 1-201 of this Original Complaint are incorporated by reference as if fully set out word for word.

203.   The acts and omissions alleged herein of Defendants are in violation of the Arkansas Civil Rights Act of 1993, A.C.A. 16-123-101, *et. seq.*, in that Dr. Davis was subjected to discrimination in the terms and conditions of their opportunity to contract based on Dr. Davis' status as an African American, for which he seeks the relief set forth, *infra*.

204.   Dr. Davis' damages for this count were proximately caused by all Defendants.

**VI.**

**COUNT 9**
**REQUEST FOR DECLARATORY RELIEF**
**(All Defendants)**

205.   The statements and allegations contained in paragraphs 1-204 of this Original Complaint are incorporated by reference as if fully set out word for word.

206.   Pursuant to Defendants' violation of 42 U.S.C. §§ 1981, 1983, and 1985 and violation of the Health Care Quality Improvement Act, Dr. Davis requests that the Court declare that Defendants' actions are not entitled to immunity under the HCQ Act, 42 U.S.C. § 11111, *et seq*.

207.   As a direct and proximate result of the actions of Defendants, Dr. Davis has expended considerable sums of money which Dr. Davis would not otherwise had been required to spend due to the necessity of overcoming the attempts of the Defendants to deny Dr. Davis' cardiology practice at JRMC.

208.   As a direct result of the foresaid actions of Defendants, all of Dr. Davis medical staff privileges at JRMC were terminated, and Dr. Davis will continue suffer substantial damages to his reputation and practice, all to his detriment.

209.   Dr. Davis incurred and will continue to incur a loss of revenues including loss of patients and loss of proceeds from the sale of medical services that Dr. Davis could reasonably anticipate if his practice of medicine had not been illegally restrained.

210.   Dr. Davis has incurred significant direct loss as a result of the actions of the Defendants alleged herein.

211.   Dr. Davis is unable at this time to state finally the amount of damages sustained and to be sustained by reason of the illegal acts of the Defendants set forth herein.  Dr. Davis would show that, but for the actions of the Defendants, Dr. Davis has suffered and will continue to suffer damages in an amount in excess of the minimum amount for diversity of citizenship cases ($75,000.00).  Further, Dr. Davis is entitled to all damages as permitted by law, including, but not limited to, declaratory relief, simple interest on actual damages, cost of suit and attorney's fees.

WHEREFORE, Plaintiff prays for judgment against the defendants as follows:

(A)     That the Plaintiff have injunctive relief against all of the defendants preventing and precluding the continuation of any conduct or actions taken in furtherance of the conspiracy being practiced against him;

(B)     That Plaintiff recover compensatory damages from the defendants individually, jointly and severally, in an amount in excess of $75,000.00 and said amount to be determined at trial;

(C)     That Plaintiff recover exemplary and/or punitive damages from the defendants individually, jointly, and severally, in an amount to be determined at trial;

(D)     That Plaintiff be granted a trial by jury;

(E)     That Plaintiff recover all costs and attorneys fees associated with the prosecution of this action; and

(F)     That Plaintiff have such other and further relief as the Court deems equitable, just and proper.

Respectfully submitted,

Gene E. McKissic
BROWN & McKISSIC, LLP
116 West 6th Avenue
P.O. Box 6116
Pine Bluff, Arkansas 71611
(870) 534-6332 telephone
(870) 534-8481 facsimile

And

Lloyd W. "Tré" Kitchens, III AR Bar #99075
Welch and Kitchens, LLC
One Riverfront Place, Suite 413
North Little Rock, Arkansas 72114
(501) 978-3030 telephone
(501) 978-3050 facsimile
**ATTORNEYS FOR THE PLAINTIFF**

38

## VERIFICATION

I have read the above and foregoing and it is true and correct to the best of my knowledge and belief.

Wherein I set my hand and seal this 24th day of February, 2009.

_____

Lee A. Davis, M.D., Plaintiff

STATE OF ARKANSAS       )
                        )ss
COUNTY OF Jefferson     )

Sworn to and subscribed before me, a Notary Public, on this 24th day of February, 2009.

_____
Notary Public

My Commission Expires:

_12/18/12_____