IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION


LEE A. DAVIS, M.D.                                           PLAINTIFF


v.                          Case No. 5:09-cv-58-DPM


JEFFERSON HOSPITAL
ASSOCIATION d/b/a Jefferson
Regional Medical Center;
ROBERT P. ATKINSON; LON
BITZER, M.D.; SHABBIR
DHARAMSEY, M.D.; HORACE
GREEN, M.D.; DAVID LUPO, M.D.;
CHARLES MABRY, M.D.; M. BILAL
MALIK, M.D.; REID PIERCE, M.D.;
RUSTON PIERCE, M.D.; JAMES
ALAN POLLARD, M.D.; RON
PRITCHARD, M.D.; and JOANN MAYS          DEFENDANTS


ORDER

Dr. Lee Davis, an African American cardiologist, had staff privileges at

Jefferson Regional Medical Center for almost four years.  After a two-year

investigation by six different committees, the Hospital revoked his privileges

based on concerns about proper documentation, professional behavior, and

quality of patient care.  Davis filed this lawsuit alleging that the Hospital's

decision was driven by racial animus rather than a concern for patients.  In

addition to the Hospital, Davis sued almost all of the doctors involved in the first stages of the Hospital's internal review.

The Defendants filed a series of summary-judgment motions, eventually reaching all the issues in the case. The parties orally argued these motions. While summary judgment should be granted sparingly in employment-discrimination cases, Rule 56 and the related precedents apply nonetheless with full force. *Lynn v. Deaconess Medical Center–West Campus*, 160 F.3d 484, 486–87 (8th Cir. 1998). The Court concludes that there is no genuine dispute of material fact on the fundamental issue: whether racial animus played any part in the revocation of Davis's privileges. No reasonable fact-finder could conclude that it did. After a thorough administrative process, the Hospital terminated Davis's privileges because of improper documentation, behavior problems, and serious concerns about patient care. The Court therefore enters summary judgment against Davis.

One preliminary point. Davis pleaded in his complaint that procedural irregularities in the Hospital's investigation removed his case from the Health Care Quality Improvement Act's immunity provisions. The Defendants assert no immunity against the civil rights claims — rightly so, because the Act

-2-

excludes civil rights violations from its immunity.  42 U.S.C.A. § 11111(a)(1) (West 2005). While immunity may bar Davis's tortious-interference claim, the Court need not reach that issue.

1.   **The Governing Law.**  Davis's lawyer acknowledged at oral argument that a loss on the race claims means the entire case falls.  He is right. Davis should get to the jury on his § 1981, § 1985(3), and § 1981 retaliation claims if he shows a genuine dispute of material fact about racial discrimination.  This requires either direct evidence of discrimination or an inference of discrimination under the familiar *McDonnell Douglas* framework. *Lake v. Yellow Transportation, Inc.*, 596 F.3d 871, 873 (8th Cir. 2010).

Direct evidence of discrimination "show[s] a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action."  *E.E.O.C. v. Con-Way Freight, Inc.*, 622 F.3d 933, 936 (8th Cir. 2010) (quotation omitted).  But the parties make no argument about direct evidence, and the Court sees none present in the record. *Anderson v. Durham D & M, L.L.C.*, 606 F.3d 513, 520 n.6 (8th Cir. 2010).

Davis must therefore raise an inference of discrimination. To make a *prima facie* case, Davis must prove four elements: (1) he is a member of a protected class; (2) he met the Hospital's legitimate expectations; (3) he suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination. *Lake*, 596 F.3d at 874. On the expectations element, precedent requires the Court to set aside the Hospital's reasons for revoking Davis's privileges, and the inquiry is whether he was otherwise qualified and meeting expectations. *Ibid*. Thus the Defendants dispute only the last element—the inference of discrimination.

After the Hospital puts forward legitimate nondiscriminatory reasons for de-credentialing Davis, he must establish a material question of fact that those reasons were a pretext for discrimination. Davis could offer evidence that the hospital "(1) failed to follow its own policies, (2) treated similarly[ ]situated employees in a disparate manner, or (3) shifted its explanation of the employment decision." *Lake*, 596 F.3d at 874. In general terms, Davis must offer evidence that the Hospital's "explanation is unworthy of credence because it has no basis in fact[ ]" or was not the real reason motivating the Hospital. *Torgerson v. City of Rochester*, 605 F.3d 584, 597 (8th Cir. 2010). This

is the kind of proof that may raise an inference of discrimination.  The Defendants also argue that Davis cannot show pretext.

Davis's case turns on his proof about race discrimination.  Evidence of other similarly situated white doctors who were treated differently must go beyond speculation or conjecture.  *Clearwater v. Independent School District Number 166*, 231 F.3d 1122, 1127 (8th Cir. 2000).  And those doctors must have been involved in, or accused of, the same offenses but disciplined differently. *Harvey v. Anheuser-Busch, Inc.*, 38 F.3d 968, 972 (8th Cir. 1994).  Ultimately, Davis must show that the hospital de-credentialed him because of his race. *Montes v. Greater Twin Cities Youth Symphonies*, 540 F.3d 852, 858 (8th Cir. 2008).

Davis's other federal claims also require proof of a racial animus.  His § 1985(3) conspiracy claim can survive summary judgment only if the Hospital and its employees conspired "with the intent to deprive [Davis], either directly or indirectly, of equal protection of the laws, or equal privileges and immunities under the laws[.]" *Barstad v. Murray County*, 420 F.3d 880, 887 (8th Cir. 2005).

Davis's retaliation claim requires proof on these elements: (1) he engaged in a protected activity; (2) he suffered an adverse employment action; and (3) there was a causal connection between the two. *Green v. Franklin National Bank of Minneapolis*, 459 F.3d 903, 914 (8th Cir. 2006). Reporting discrimination to a supervisor is a protected activity. *King v. Hardesty*, 517 F.3d 1049, 1064 (8th Cir. 2008). Davis must also show that any legitimate nondiscriminatory reasons for de-credentialing him were a pretext for retaliation. *Green*, 459 F.3d at 914.

**2.     The Undisputed Facts.** Many of the facts are undisputed. Where there is a dispute, the Court takes the facts to be as Davis contends. *Con-Way Freight*, 622 F.3d at 936. Davis is also entitled to all reasonable inferences. *Ibid.* Because this is an employment discrimination case, "internal documents relied upon by the employer in making an employment decision are not hearsay[.]" *Wolff v. Brown*, 128 F.3d 682, 685 (8th Cir. 1997). The documents considered by the Hearing Panel, from which both parties argue, are a part of the summary-judgment record.

In August of 2003, Davis was granted medical staff privileges at the Hospital. *Document No. 127, at 1--2.* These privileges allowed Davis to admit

and treat patients. *Ibid.* The Hospital's Credentialing Policy required good behavior and professional competency. "Appointment to the staff and associated clinical privileges shall be extended only to professionally competent physicians . . . who continuously meet the qualifications and requirements set forth in this policy, conform to the standards of patient care imposed by law and herein, and continuously demonstrate an ability to work harmoniously with others in the orderly rendering of quality patient care[.]" *Document No. 110, at 2; Document No. 127, at 2.*

**Early Behavioral Troubles.** Davis started having collegial interventions during his first year. The interventions flowed from incidents with various staff members. Davis does not dispute every reported incident. And he admits to some.

His August 2004 incident with Nurse Sherry Yeggy-Nail, for example, is undisputed. Davis admits the incident happened and that he used profanity. A follow-up letter from Director of Credentialing Dr. Reid Pierce summarizes the Hospital's view: "[t]he use of profanity or any type of verbal abuse is not the proper method for venting your frustrations." *Document No.*

-7-

*108–2, at tab 2.*   Davis contests only whether he cursed at Nurse Yeggy-Nail or at himself. *Document No. 126, at 5.*

In late 2005, Davis had an incident with hospital administrator Morie Mayhew.  *Document No. 126, at 6.*   This incident stemmed from problems between Davis and Director of Quality Dr. Charles Mabry.   According to Davis, "Mabry called me in to review the chart but had not read the medical chart prior to our meeting.  I stopped the initial conference with Dr. Mabry because it was obvious he was unfamiliar with the chart in question and did not have the chart present[.]" *Document No. 125-2, at 3.*

Davis admits to using profanity with Mayhew: "I responded that [Mayhew's] answer was [expletive] and he was an idiot if he thought it was appropriate to question my care prior to review of the chart[.]" *Ibid.*   Reid Pierce was present for the follow-up collegial intervention where Davis "acknowledged this behavior [with Mayhew] and agreed with the assessment thereof." *Document No. 108-2, at tab 4.*

In late December 2005, Davis declined to join a cardiology joint venture with the Hospital.  *Document No. 108-2, at tab 5.*   Davis claims the Hospital then fabricated a January 2006 incident between a floor of nurses and him.

-8-

Seven nurses signed a typed statement about this incident, accusing Davis of abusive behavior. *Document No. 108-2, at tab 8.* Davis denies using profanity against the nurses. *Document No. 126, at 6--7.* He previously testified, however, that he called himself a profane name in front of the nurses. *Document No. 108-6, at 42–43.*

Davis claims that one nurse recanted her statement, admitting she was forced to submit a complaint. *Document No. 126, at 7.* He also claims that other African American nurses present saw nothing inappropriate and were not interviewed by the Hospital. Davis's deposition testimony provides the only proof in the record of either fact.

**Documentation.** Davis also had trouble keeping his medical records current. His privileges were suspended twice—in March and in July of 2004—for record delinquencies. *Document No. 125-2, at 7.* Davis "was sometimes behind on dictation of operation reports due to [his] dictating operative notes on weekends because [he] was too busy during week days." *Document No. 125-2, at 9.*

**Patient Care Issues.** The Hospital's concerns about Davis eventually turned to quality of care. In March 2006, Davis was referred to the Invasive

Procedure Committee because he failed to respond to a patient in the Intensive Care Unit. *Document No. 108-2, at tab 36*. Davis says he did no wrong. *Document No. 108-2, at tab 57*. But it is undisputed that his patient eventually suffered complications. From this April 2006 meeting forward, Davis's quality of patient care was an ongoing concern for the Hospital. *Ibid*.

A month later, Davis told Reid Pierce that he "would not be doing well for long." *Document No. 126, at 9*. This encounter was due to Reid Pierce's handling of a suspected sexual-harassment complaint against Davis. *See Document No. 108-2, at tab 129*. Around this time Davis also had another incident with Mabry.

The next month, Dr. David Lupo, the chair of the Credential Committee, notified Davis that he was being investigated for "behavioral conduct[.]" *Document No. 108-2, at tab 59*. An Investigative Committee met to determine the scope and direction of the investigation. *Document No. 108-2, at tab 62*. The Committee considered the Invasive Procedure Committee complaint about Davis's patient-care issues in addition to other complaints about Davis's behavior. Mabry made a power-point presentation to the Committee about Davis's quality of patient care. *Ibid. at p. 856*. Davis met with the

Committee to defend his actions. The investigation culminated in a corrective action plan for Davis. *Document No. 108-2, at tab 75 p. 646a.*

**The Corrective Action Plan.** In July 2006, Davis was put on an eleven-page corrective action plan by the Credential Committee. *Document No. 108-2, at tab 75 p. Davis-886.* Davis did not sign the plan. *Ibid. at p. 896.* It required Davis to submit to random drug tests, refrain from sexual harassment, and attend some form of anger management class. Some of the requirements had zero-tolerance provisions. The plan also addressed concerns about Davis's delay in documenting his procedures.

Davis missed multiple deadlines to choose an anger management program. Months after the first deadline, Davis submitted a ten-to-fourteen hour anger management course as an alternative to the Committee's suggested programs. Internal letters show doubts among the Committee members about Davis's chosen program. Despite these doubts, Davis's psychiatrist was invited to attend a Committee meeting so she could tailor a program to Davis's specific needs.

The Committee also crafted a special form for Hospital staff to report Davis's violations of the plan. *Document No. 108-2, at tab 89, p.20.* This form

-11-

included general questions about the use of profanity or abusive behavior by Davis and other doctors.  Davis says he complied with the plan.  And the nursing staff indicated an improvement in Davis's behavior.

Immediately after an October 2006 Credential Committee meeting, however, Davis stopped Dr. JoAnn Mays — a Committee member — and told her she should be "ashamed" of herself. *Document No. 108-2, at tab 85, p. 204.* This incident was documented in the Committee's minutes.  Davis offers no explanation for this incident.  And the minutes note that many other conduct-related complaints had been made about Davis. *Document No. 108-2, at tab 89, p. 19.*

**Davis's First Major Suspension.**  The Credential Committee voted to suspend Davis's privileges on 18 December 2006. *Document No. 108-2, at tab 93, p.219–20.*  The Hospital's legal counsel intervened, however, three days later.  The Committee then voted to table Davis's suspension pending further investigation. *Document No. 108-2, at tab 95, p. 223.*

**Continuing Problems.**  Meanwhile, Davis continued to have incidents with the hospital staff.  Mabry wrote a letter in March of 2007 to the hospital administration about yet another confrontation with Davis.  After an Invasive

-12-

Procedure Committee meeting, Davis told Mabry "I am watching you and you better be careful." *Document No. 125-2, at 7.* Mabry wrote a letter about this incident. "This is not the first time he has threatened me . . . . I ask the Credentials Committee to review this incident and discipline him for verbally threatening me." *Document No. 108-2, at tab 107, p. 192.*

Then the Credential Committee began investigating Davis's failure to abide by the corrective action plan. *Document No. 108-2, at tab 114.* The Committee also appointed an Ad-Hoc Committee to investigate Davis. *Document No. 108-2, at tab 126, p.684a.* That Committee concluded that Davis fell below the standard of care in behavior and documentation. *Document No. 108-2, at tab 128, p. 730a.* It made no decision, however, about quality of patient care: "The [Ad-Hoc] Committee reviewed preliminary data from the Quality Department.   The Committee felt this area required further investigation by peer review committees before any decision could be made regarding standard of care[.]" *Ibid.*

**The Second Revocation.**  Based on the Ad-Hoc Committee's findings, the Credential Committee voted to revoke Davis's privileges on 22 May 2007 for fourteen days. *Document No. 108-2, at tab 130, p.733a.*  Davis was again

directed to complete an anger management course, bring all of his operative notes into compliance, and to follow the behavioral code of conduct. *Ibid.*

In late June 2007, the Invasive Procedure Committee, chaired by Dr. Lon Bitzer, sent four of Davis's cases where the patient had died for external review. *Document No. 108-2, at tab 135, p. 341a; tab 137, p.354a.* Nine of Davis's patient deaths had been reviewed internally, and these four were found to be below the standard of care. The internal reviews, highly critical of Davis's treatment, were also forwarded to the outside reviewers. By June 2007 Davis had hired a lawyer. *Document No. 108-2, at tab 134.* Around the same time, Dr. Mabry had concluded that Davis's mortality rates were double that of the other cardiovascular surgeons. *Document No. 108-2, at tab 136, p. 352a.*

Dr. Jerrold Glassman's outside review came back in early July 2007. *Document No. 108-2, at tab 137, p.357a.* Glassman concluded that Davis had seriously violated the standard of care, resulting in four patient deaths. "In each of those 4 cases, I found significant and severe deviation from standard of care. I believe each of the 4 cases were preventable deaths. That is, that if proper care, common sense, technical ability, and standard medical knowledge was used, each of those 4 individuals would be alive." *Document*

-14-

*No. 108-2, at tab 137, p.357a.*   Dr. John Henderson's external review came back in late July; and he also concluded that Davis had violated the standard of care. *Document No. 108-2, at tab 143, p. 412a, 419a–423a.*   Dr. Henderson found this: "Poor judgment in selection of patients for cardiac cath and poor documentation of need.   Technical performance of cardiac cath and interventions do not meet standard of care . . . . Disastrous complications[.]" *Document No. 108-2, at tab 143, p. 423a.*

**The Final Suspension.**   In a 10 July 2007 letter, Dr. Lupo requested Davis's attendance at a hearing in two days to discuss "concerns over the recent death of four of your patients undergoing heart catheterization[.]" *Document No. 108-2, at tab 138, p. 401a.*   Davis asked for a one-week extension to prepare. *Ibid. at 402a.*   Lupo conditionally agreed to the extension if Davis's lawyer would "assure [him] in writing that Dr. Davis [would] not perform or attempt to perform any invasive procedures in the Cath Lab at JRMC between [then] and the time the Committee meets[.]" *Document No. 108-2, at tab 139, p. 403a.*   Davis refused, so the Committee met and voted for a precautionary suspension of Davis's privileges. *Document No. 108-2, at tab 139 & 140.*

-15-

A week later the Committee met again with Davis and accepted his two outside reviews. Davis's reviewers concluded that Davis had not violated the standard of care. *Document No. 108-2, at tab 143, p. 412a.* His reviewers reached their conclusions without having considered the Hospital's internal reviews, which were highly critical of Davis's treatment. The Committee unanimously voted to recommend revocation of Davis's privileges. *Document No. 108-2, at tab 144.*

Davis does not believe his appeal to the five-member Hearing Panel was handled in a discriminatory manner. *Document No. 127, at 7.* That Panel held more than thirteen separate hearings during a three-month period where Davis was represented by counsel. There Davis cross-examined every witness. He put forward his version of events. And the Hearing Panel voted unanimously to recommend revocation. *Ibid.*

Davis does not allege racial animus in the four-member Review Panel that unanimously accepted the recommendations of the Credential Committee and the Hearing Panel. *Document No. 127, at 7.* And Davis does not allege any racial animus in the Hospital's fourteen-member Board of Directors, *Document No. 127, at 8–9* — the governing body that made the final

-16-

decision to revoke Davis's privileges based on the other committees' recommendations.

Davis can identify no other physicians on the Hospital's medical staff who had — in terms of quantity and quality — as many patient-care issues as he did. *Document No. 127, at 7.* Nor can he identify any physicians with patient-care issues *and* behavioral issues. *Document No. 127, at 8.*

**Racial Animus?** On the central issue of racial animus, Davis points to five parts of the record. Davis contends that a genuine dispute of material fact exists about these things: (1) Dr. Reid Pierce's discrimination against Davis; (2) Dr. Marbry's discrimination against Davis; (3) the Hospital's failure to react to Davis's complaint about this discrimination; (4) the Hospital's premature reporting of Davis to the National Practitioner's Data Bank; and (5) Davis's eleven affidavits from nurses and doctors showing that Davis was treated differently.

**Dr. Reid Pierce.** The Defendants do not dispute that Dr. Reid Pierce contacted a nursing student about possible sexual harassment by Davis. A letter from the student in the Defendants' exhibits supports the reasonable inference that Pierce was on the look out for issues that might undermine

Davis. *Document No. 108-2, at tab 129.* The Hospital, however, found no sexual harassment and Davis was not disciplined. The Defendants say Reid Pierce was merely investigating a verbal complaint of sexual harassment. Davis says this was an act in the furtherance of the conspiracy to de-credential him, and violated Hospital policy. *Document Nos. 114, at 3 & 130, at 1--2.*

It is undisputed, however, that Reid Pierce could not vote on the Credential Committee, and that Pierce was powerless to make official recommendations to the Committee. *Document No. 114, at 2.* Davis presents no evidence that Reid Pierce's investigation of the student's potential sexual-harassment claim was racially motivated. It is undisputed that Pierce and Davis had a rocky professional relationship. Davis, moreover, has not offered any evidence that the Credential Committee acted as a "conduit, vehicle, or rubber stamp" for Reid Pierce's information. *Qamhiyah v. Iowa State University of Science and Technology,* 566 F.3d 733, 742–45 (8th Cir. 2009). Davis's proof about Dr. Reid Pierce does not raise a reasonable inference of discrimination.

**Dr. Charles Mabry.** Davis had many incidents with Mabry. And Mabry made multiple power-point presentations to virtually every committee that reviewed Davis's conduct. Davis claims the calculations in these

-18-

presentations were incorrect. But there is no evidence in the record undermining Mabry's calculations.

At oral argument, Davis compared two exhibits. One was Mabry's email about mortality calculations, which indicated a large number of total cases surveyed. The second — Mabry's final calculations — showed a smaller number of total cases. The Defendants press that the revised methodology was applied equally to all cardiologists. Davis says the differing numbers show Mabry's discrimination.

The modest changes in these numbers do not give rise to an inference of discrimination. Davis's evidence falls far short of even showing that Mabry's calculations were suspect. Most importantly, those calculations were one component of the Hospital's multi-faceted decision to revoke Davis's privileges — a decision made by multiple decision-makers whom Davis agrees acted without racial animus.

**Davis's alleged discrimination complaint.** Davis says he complained about discrimination to the Hospital. His complaint pleaded that Davis notified Executive Vice President Tom Harbuck, CEO Robert Atkinson, a member of the Board of Directors, and Cardiac Administrator Bill Bledsoe on

11 November 2005 about Reid Pierce and Mabry's "bias and racial discrimination." *Document No. 2, at 11.* This was a few months before Davis opted out of the cardiology joint venture. But Davis offers no proof of this alleged complaint, and no such communication is in the record. The Defendants deny Davis engaged in a protected activity. *Document No. 110, at 12.*

Though not mentioned by the parties, the Court also notes a 14 February 2006 letter to Atkinson, a member of the Hospital's Board of Directors. In that letter, Davis asked for an update about the "Medical Staff and Quality Management . . . . biases and discrimination towards [him]." *Davis-272.* Nothing in the record suggests this letter was a part of the eventual decision to revoke Davis's privileges. Ten months passed before the Credentialing Committee first voted to revoke Davis's privileges. And almost seventeen months passed before the Committee's final revocation recommendation. The letter, moreover, does not mention Reid Pierce or Mabry, nor does it allege race discrimination. Davis's unsubstantiated claim about making a complaint alleging discrimination is insufficient as a matter of law to create a fact question on pretext. *Green*, 459 F.3d at 915–17;

*Clearwater*, 231 F.3d at 1127

   **Reporting to the National Practitioner's Data Bank.**   Davis claims that the Hospital prematurely reported him to the National Practitioner's Data Bank.   He pleaded that the Hospital did not follow its internal procedures during the investigation and de-credentialing.   Specifically, the Hospital reported him after the July 2007 precautionary suspension, but "[w]hite physicians under precautionary suspension have not been reported by JRMC to the National Practitioner's Data Bank until after final action by the Board of Directors."   *Document No. 2, at 26.*   Davis gives no specifics about this allegation in his papers.   At the summary-judgment hearing, Davis argued that Dr. Herzog, a white doctor who was also temporarily suspended, was not reported to the National Practitioner's Data Bank some fifteen years before Davis was suspended.   This statement, which is undocumented in the record nor alleged in the pleadings, is insufficient as a matter of law.   FED. R. CIV. P. 56(c)(2); *Clearwater*, 231 F.3d at 1127.   Davis offers insufficient proof to create a genuine issue of material fact here.

   **The three-year-old affidavits.**   Davis ends by pointing to eleven affidavits from 2007 to create a fact question on racial animus.   In the

affidavits, doctors, nurses, and staff at the Hospital swore that Davis was treated differently than similarly situated white doctors.   These form affidavits do not name the similarly situated doctors.  They speak in terms of white doctors who had behavior problems, not substantial patient-care issues and behavior problems.  And after three years and the opportunity for full discovery, Davis admits that he cannot identify any white doctor with the same patient care issues who was treated differently.  These pre-suit affidavits are simply too general and too speculative to create a genuine issue on racial animus at this point in the case. *Clearwater*, 231 F.3d at 1127.  At best, this proof shows other doctors who used profanity or abusive language were not disciplined like Davis.  But the affidavits do not touch the key issue: whether those doctors had the same issues with quality of patient care.   These affidavits, therefore, do not support sending this case to the jury. *Ibid.*

**Invocations of Racial Animus.**  Race is mentioned in other parts of the record.  Davis does not argue from these stray remarks.  The Court has considered them nonetheless to give Davis the full benefit of the record.

For example, the report about the 2006 nursing incident claims that Davis told the nurses they were not taking his orders or his male nurses's

orders because he and his nurse were black. *Document No. 108-2, at tab 8, p.251.* The Court counts fourteen other invocations of racial animus or conspiracy in the Defendants' multi-volume exhibits to the third motion for summary judgment. *Document No. 125-3.* All of these invocations, however, were statements made by Davis and reported by others, with one exception.

In a June 2006 Investigation Committee meeting, with Reid Pierce in attendance, the minutes note a discussion about race: "[Davis] denied ever 'using the race card', despite the fact that he has stated that he has been targeted because he is black." *Document No. 108-2, at tab 74, p.874.* This sentence, in the official Investigation Committee minutes, is phrased in a racially charged manner. But the parties make no argument about this stray document. And this early report—which was not a basis for discipline—is not enough to create a genuine factual dispute about discrimination. *Qamhiyah*, 566 F.3d at 742–45; *Smith v. Fairview Ridges Hospital*, No. 08-1942, 2010 WL 4226529, at *5 (8th Cir. 27 October 2010) (hostile work environment case).

3.  **Davis's Federal Claims Fail.** The Hospital terminated Davis's privileges because of improper documentation, behavior problems, and

serious concerns about patient care after a thorough administrative process. Davis presented insufficient evidence to raise an inference of discrimination. He has therefore failed to make a *prima facie* case or create a fact question on whether the Hospital's stated reasons were a pretext for discrimination. *Lake*, 596 F.3d at 874–75. His lack of proof is fatal to all his federal claims.

Davis strongly presses that the Hospital's stated reasons for de-credentialing him were wrong. But Davis has not contested every basis for his de-credentialing: he admits to being behind in documentation; he does not contest all of the behavioral complaints; he admits to using profanity on many occasions; and he does not adequately challenge the Hospital's information about his patient-care issues. Most importantly, Davis cannot show that the Hospital ever treated any similarly situated white doctor differently. The Court, on this record, "do[es] not sit as a super-personnel department that reexamines an entity's business decisions." *McNary v. Schreiber Foods, Inc.*, 535 F.3d 765, 770 (8th Cir. 2008) (quotation omitted). Davis's § 1981 claim is therefore dismissed with prejudice.

Davis also failed to create a genuine issue about his § 1985(3) conspiracy claim. *Barstad*, 420 F.3d at 887. And he did not show a *prima facie* case about

retaliation, or that the Hospital's legitimate nondiscriminatory reasons were a pretext for retaliation. *Green*, 459 F.3d at 914–17. Those claims are dismissed with prejudice as well.

**4.    State-Law Claims.**    Davis also pleaded state-law claims for violation of the Arkansas Civil Rights Act and for tortious interference with a business expectancy. The former is identical to his § 1981 claim. *Humphries v. Pulaski County Special School District*, 580 F.3d 688, 692 n.3 (8th Cir. 2009). This law is well settled. The Court therefore exercises supplemental jurisdiction over Davis's Arkansas Civil Rights Act claim and dismisses it with prejudice. 28 U.S.C.A. § 1367(a) (West 2006); *McRaven v. Sanders*, 577 F.3d 974, 978 & 984 (8th Cir. 2009). But Davis's tortious-interference claim is not "so related" that it "form[s] part of the same case or controversy[.]" The Court therefore dismisses that claim without prejudice. 28 U.S.C.A. § 1367(c)(3) (West 2006)

\* \* \*

The Defendants' third motion for summary judgment, *Document No. 108*, and Reid Pierce's fourth motion for summary judgment, *Document No. 112*, are granted. Davis's § 1981, § 1985(3), § 1981 retaliation, and Arkansas

Civil Rights Act claims are dismissed with prejudice.  His tortious interference with a business expectancy claim is dismissed without prejudice.  The other summary-judgment motions, *Document Nos. 49, 52, 53, 54, 62, 64, 66, & 99,* are denied as moot.

So Ordered.

D.P. Marshall Jr.
United States District Judge

15 Dec. 2010